UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

1-800 WATER DAMAGE
INTERNATIONAL LLC,

     Plaintiff,

                                 Case No. 2:24-cv-10110

v.                                 Honorable Linda V. Parker

RESTORATION RX, LLC
ET AL.

     Defendants.

_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (ECF No. 4)

This matter is before the Court on Plaintiff 1-800 Water Damage International, LLC ("Plaintiff")'s motion for preliminary injunction.  (ECF No. 4.) Defendants Restoration RX, LLC ("Defendant Restoration"), Gerald Cleveland ("Defendant Gerald"), and Jenteal Cleveland ("Defendant Jenteal") (collectively "Defendants") have filed an opposition and Plaintiff has filed a reply.  (ECF Nos. 7, 10.)

Finding the facts and legal arguments adequately presented in the parties' filings, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the following reasons, Plaintiff's motion is granted.

## I.   FACTUAL AND PROCEDURAL HISTORY

Plaintiff is a property damage and restoration company with nearly 180 franchisees across thirty-three states.  (ECF No. 4-1 at PageID. 236.)  Plaintiff is also the owner of the following registered trademarks: "1-800 WATER DAMAGE®", United States Patent and Trademark Office ("USPTO") Registration No. 5,164,984; "1-800 WATER DAMAGE®", USPTO Registration No. 2,982,370; design mark "1-800 WATER DAMAGE®", USPTO Registration No. 3,688,386; design mark "1-800 WATER DAMAGE®", USPTO Registration No. 3,047,978; and "RESTORING WHAT MATTERS MOST®", USPTO Registration No. 5,160,158.  (*Id.*)

On December 27, 2019, the parties entered into two separate franchise agreements to operate a 1-800 Water Damage franchise in the Salt Lake City area of Utah.  The franchise agreements detailed the procedures, methodologies, and standards applicable to the operation of the franchise.  (*Id.*)  Approximately four years after entering the agreements, citing financial difficulties, Defendants sought to terminate the agreements prior to the end of their terms.  (ECF No. 7-2 at PageID. 415.)

### The Franchise Agreements

The agreements contain several relevant provisions to the operation of a franchise.  First, the terms of the franchise agreements are ten years from the dates

of the agreements.  (ECF No. 1-1 at PageID. 22, 107.)  Since the parties entered

into the agreements on December 27, 2019, the terms of the agreements are from

December 27, 2019, to December 27, 2029.  The agreements also require

Defendants to contribute 2% of their gross sales to the System's National

Marketing Fund on a monthly basis to assist in advertising.  Specifically, the

agreements state:

> We [Plaintiff] will use the National Marketing Fund contributions, in
> its sole discretion, to develop, produce and distribute national, regional
> and/or local advertising and to create advertising materials and public
> relations programs which promote, in our sole judgment, the services
> offered by System franchisees and Managing Operators. . . . We
> [Plaintiff] will prepare on an annual basis, within 120 days of the end
> of the fiscal year, and make available to you [Defendants] upon written
> request, a statement of contributions and expenditures for the National
> Marketing Fund.

> (*Id.* at PageID. 31-32, 116-17 (alterations added).)

Moreover, the agreements require the franchisee to: (1) purchase certain

equipment (*see id.* at PageID. 24, 109); (2) pay monthly royalties on certain

services (*see id.* at PageID. 28, 113); and (3) continuously and actively operate the

business without a break of five (5) consecutive days (*see id.* at PageID. 64, 149).

Lastly, the agreements' non-compete provisions preclude the operation of a

competing business during the term of the agreements or use of the 1-800 Water

Damage trademarks in any other business.  Specifically, the non-compete provisions read:

> During the term of this Agreement, neither you and your Managing Owner, Managing Owner's immediate family members, your Designated General Manager (if applicable) and Service Technician shall not:
>
> 1. engage as an owner, partner, shareholder, director, officer, employee, consultant, agent, or in any other capacity in any other business offering Remediation Services that are the same as or similar to the services sold by the 1-800 WATER DAMAGE Business and/or the services provided by our affiliates (except for other franchises or authorizations we enter into with you);
>
> 2. use our Confidential Information, System, 1-800 WATER DAMAGE owners' intranet website, Operations Manual, Marks, Customer lists, Customer Information, trade secrets, trade dress, proprietary knowledge, or know-how, or any colorable imitations, in the design, development, or operation of any business other than the 1-800 WATER DAMAGE Business franchised hereunder, unless specifically authorized by us[.]

(*Id.* at PageID. 45, 130 (alteration added).)

<u>The Parties' Conduct</u>

Three and a half years into the term of the franchise agreements, issues began to arise between the parties.  On June 5, 2023, John Otero, Regional Business Coach for Plaintiff, provided Defendants with a purchase order for equipment to operate their franchise, namely forty (40) Water Damage Air Max Air Movers, and five (5) DryMax BLE Dehumidifiers, by Water Damage affiliate company, Colman-Wolf Supply Co, in the amount of approximately $23,000.00.

4

(ECF No. 4-1 at PageID. 337.) Defendants approved the purchase order, received the equipment, but did not make any payments. (*Id.*)

The parties engaged in discussions about a payment plan over the next several months, but no payment was made. (*Id.* at PageID. 338.) Specifically, on November 10, 2023, four months after taking delivery of the equipment, Mr. Otero spoke with Defendant Gerald on the phone to discuss a payment plan for the equipment, during which Defendant Gerald stated he would have a response by Monday, November 13, 2023. (*Id.*) At the conclusion of the call, Defendant Gerald expressed frustration that his business was not being properly supported. (*Id.* at PageID. 338-39.)

Later that same day, November 10, 2023, Defendant Gerald emailed Mr. Otero, stating: "Due to the state of the business I would like to know [what] it would take to exit out of my contract." (*Id.* at PageID. 339 (alteration added).) Defendant Gerald also made a request, in accordance with the franchise agreements, for a statement of contributions and expenditures for the National Marketing Fund, which Plaintiff failed to provide. (ECF No. 7-2 at PageID. 45.)

On December 8, 2023, Defendant Gerald informed Mr. Otero that he was closing the franchise. (ECF No. 4-1 at PageID. 339.) On December 10, 2023, Defendant Gerald informed Mr. Otero that operating the franchise under the current model has not yielded him success as he had to hire his own marketing

5

firms to improve his search engine optimization and would be changing his Google Business Profile.  (*Id.*)  The parties discussed options moving forward, such as waiving Defendants' royalty obligations, as he failed to timely pay them in October, November, and December 2023, but no agreement on the termination of his franchise was reached.  (*Id.* at PageID. 353; ECF No. 1 at PageID. 7.)

In January 2024, Defendants rebranded their business from a 1-800 Water Damage franchise to Restoration RX, a competing business offering: (1) water damage restoration; (2) fire damage restoration; (3) mold removal; (4) flood damage cleanup; (5) biohazard cleanup; and (6) fire and smoke cleanup.  (*Id.* at PageID. 378.).  However, despite the rebrand, Defendants continue to use Plaintiff's trademarks in their Google Business Profile, Facebook pages, and online reviews.  (*Id.* at PageID. 236-37.)

On January 16, 2024, Plaintiff filed this lawsuit, asserting the following claims: (I) breach of contract against Defendant Restoration RX, LLC; (II) breach of contract against Defendants Gerald Cleveland and Jenteal Cleveland; (III) unjust enrichment against all defendants; and (IV) Federal Trademark Infringement against all defendants.  (ECF No. 1.)

In support of Counts I and II, Plaintiff alleges that Defendants: (1) failed to pay appropriate royalties for October, November, and December 2023; (2) failed to operate the business continuously and actively, having taken a break in operation

for five (5) consecutive days; and (3) are continuing to use Plaintiff's federally registered Marks in connection with their internet directory listings and Google Business Profile for its competing business. (*Id.* at PageID. 11-15.)

## II. LEGAL STANDARD

"[T]he preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.'" *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)). The party moving for the injunction has the burden to show that the circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

When a party moves for a preliminary injunction, the district court considers four factors to determine whether to grant relief: (1) the likelihood of success on the merits of the action; (2) the irreparable harm which could result without the requested relief; (3) the possibility of substantial harm to others; and (4) the impact on the public interest. *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985).

<u>Parties' Arguments</u>

Plaintiff argues that it has a likelihood of success on the merits of breach of contract and infringement claims. The Court finds that Plaintiff only has a

likelihood of success on its breach of contract claims. Plaintiff has not presented evidence for the Court to conduct a comparative analysis of its trademark usage as required to make a finding of a likelihood of success on the merits of its infringement claim. Thus, the Court will focus its analysis to Plaintiff's breach of contract claims.

i.   <u>Plaintiff's Arguments</u>

Plaintiff argues: (1) the agreements' non-compete terms are unambiguous; (2) the agreements' non-compete terms are reasonable; (3) Defendants continue to violate the non-compete provisions; (4) Defendants' activities will cast Plaintiff's brand in a negative light, causing irreparable injury; (5) any breach by Plaintiff is immaterial and does not invoke the "first substantial breach" rule; (6) the balance of equities weighs significantly in its favor; (7) and the public interest will not be harmed by the granting of the injunction. (ECF No. 4 at PageID. 213-227; ECF No. 10 at PageID. 433-35.)

ii.   <u>Defendants' Arguments</u>

Defendants argue that Plaintiff does not have a likelihood of success as: (1) the noncompete provision is unenforceable because Plaintiff does not have any legitimate protectable business interests; (2) the non-compete provision is unenforceable as Plaintiff is the first materially breaching party by failing to provide the statement of contributions for advertising; (3) Plaintiff has unclean

8

hands; (4) Plaintiff has offered only mere speculation to support a finding of irreparable harm; and (5) the harm caused by the entry of a preliminary injunction would outweigh the harm absent the injunction. (ECF No. 7.)

### III. LEGAL ANALYSIS

*LIKELIHOOD OF SUCCESS*

The Court finds that Plaintiff has a likelihood of success on the merits of its breach of contract claims. "In order to establish a likelihood of success on the merits, the movant must generally show that there is a 'strong or substantial' probability of success." *Great Lakes Home Health Servs. Inc. v. Crissman*, No. 15-CV-11053, 2015 WL 6667772, at *3 (E.D. Mich. Nov. 2, 2015) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

The party asserting a breach of contract must demonstrate, by a preponderance of the evidence, that: (1) there was a contract between the parties, (2) a breach of its terms by the other party, and (3) damages resulting to the party claiming the breach. *See Miller-Davis Co. v. Ahrens Constr., Inc.*, 848 N.W.2d 95, 104 (Mich. 2014).

Defendants do not dispute that a contract existed between the parties or whether a breach or damages occurred. Rather, they dispute the validity of the agreements' non-compete provisions, specifically asserting that Plaintiff does not

have any legitimate interests, such as confidential or trade secret information. (ECF No. 7 at PageID. 405.).

"The burden of demonstrating the validity of the [non-compete] agreement is on the party seeking enforcement." *Mapal, Inc. v. Atarsia*, 147 F. Supp. 3d 670, 677 (E.D. Mich. 2015) (alteration added) (citing *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 545 (2007)). An agreement not to compete is enforceable if it: (1) protects the employer's reasonable competitive business interests; and (2) is reasonable in duration, geographical scope, and type of employment or line of business. *See id.* (citing *St. Clair Med., P.C. v. Borgiel*, 715 N.W.2d 914, 919 (2006)).

Plaintiff argues that the agreements' duration, scope, and type of employment are reasonable, as: (1) they clearly identify the prohibitions on competitive business activity during and after the termination of the agreements (ECF No. 4 at PageID. 214); (2) the post-termination non-compete period is reasonable as it is limited to only two years (*see id.* at PageID. 216; *see also* ECF No. 1-1 at PageID. 70, 155); (3) the geographic scope is reasonable as it is only limited to the franchisee's former territory, territories assigned to other franchisees as of the date of terminations, and a 100 mile radius outward from the franchisee's former territory (*see id.* at PageID. 217-18); and (4) the agreements only prohibit performance of restoration services similar to those provided by Plaintiff, rather

10

than a blanket prohibition on "use of general knowledge or skill" (*see id.* at PageID. 218.)

As previously mentioned, Defendants do not dispute the reasonableness of the agreements' duration, scope or type of employment.  (*See* ECF No. 7 at PageID. 404-06 (arguing unenforceability due to lack of reasonable business interests.)  They dispute the second factor of the reasonableness analysis, whether Plaintiff has a reasonable competitive business interest.

An employer's reasonable competitive business interests include preventing the anticompetitive use of confidential information, close contact with the employer's customers or customer lists, or cost factors and pricing.  *See id.* Plaintiff's customers and customer lists are a protected interest, which Defendants seek to obtain and service with their restoration services.  Thus, the non-compete provision is likely enforceable, as it protects Plaintiff's reasonable interests in its business, customers, and customer lists for the term of the agreements, and is reasonable in its duration, scope, and geographic limits.

  i.   <u>Michigan's First Substantial Breach Rule</u>

Defendants argue that the first substantial breach rule precludes relief as Plaintiff failed to produce the advertising statements as required by the agreements. The first substantial breach rule is inapplicable to this matter.  Michigan adheres to the first substantial breach rule, which states that the "[o]ne who first breaches a

11

contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *L.A. Ins. Agency Franchising, LLC v. Kutob*, 817 F. App'x 52, 60 (6th Cir. 2020) (alteration added) (quoting *Michaels v. Amway Corp.*, 522 N.W.2d 703, 706 (Mich. Ct. App. 1994)). As the name implies, the first substantial breach rule "only applies when the initial breach is substantial." *Id.* In *Baith v. Knapp-Stiles*, the Michigan Supreme Court held:

> [T]he words 'substantial breach' . . . must be given close scrutiny. Such scrutiny discloses that the application of such a rule can be found only in cases where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other.

> 156 N.W.2d 575, 579 (Mich. 1968) (alteration added) (citing *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 343 (1964)).

The Court finds that Plaintiff likely did not commit a first substantial breach when it failed to remit the requested advertising statements. First, Defendants accepted $23,000 worth of machinery from Plaintiff, without paying for it, in violation of the agreements' requirements that payment is required for the provision of equipment. Second, Defendants did not pay royalties for the months of October, November, and December 2023, as required by the agreements. As a result, Defendants are likely the first party to substantially breach the contract.

Furthermore, the Court is not convinced that Plaintiff's failure to provide the advertising statements is a substantial breach that would render performance by Defendants ineffective or impossible.  Plaintiff's failure to deliver on this request did not negatively impact Defendants' obligations or cause it to violate the terms of the agreement, as they were seeking to terminate the contract with Plaintiff, citing financial difficulties, on the same day the request for the advertising statement was made.  Thus, the first substantial breach rule is inapplicable.

ii.   The Unclean Hands Doctrine

Defendants also argue that the unclean hands doctrine precludes relief, however, the unclean hands doctrine is inapplicable.  "The unclean hands doctrine states that a party seeking the aid of equity must come to court with clean hands." *Watts v. Mortg. Bridge Sols.*, No. 16-10552, 2016 WL 8188768, at *11 (E.D. Mich. Dec. 7, 2016) (citing *McFerren v. B & B Inv. Grp.*, 655 N.W.2d 779, 783 (Mich. Ct. App. 2002)).  "The clean hands maxim 'is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.'"  *McFerren*, 655 N.W.2d at 783 (quoting *Rose v. Nat'l Auction Grp.*, 646 N.W.2d 455, 463 (Mich. 2002)).

The Court does not find that Plaintiff has unclean hands that exclude relief. It appears that, after making the request for advertising statements, the parties

13

sought to come to an understanding on the terms of the agreement, with Plaintiff offering concessions, such as waiving the overdue royalty fee obligation.  This is not indicative of bad faith.  Thus, Plaintiff's failure to produce the requested advertising statements does not render its hands 'unclean' that are 'tainted with inequitableness or bad faith' to disqualify it from equitable relief.

As a result of the above, the Court finds that Plaintiff has a likelihood of success on its breach of contract claims and this factor weighs in favor of granting the preliminary injunction.

*IRREPARABLE HARM*

"An injury is irreparable if the harm is difficult to calculate."  *RECO Equip., Inc. v. Wilson*, No. 20-4312, 2021 WL 5013816, at *4 (6th Cir. Oct. 28, 2021). Moreover, a party's harm is "irreparable" when it cannot be adequately compensated by money damages.  *Eberspaecher N. Am., Inc. v. Van-Rob, Inc.*, 544 F. Supp. 2d 592, 603 (E.D. Mich. 2008).  "[L]oss of customer goodwill" and damage to "competitive position" are harms that are difficult to calculate.  *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001); *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2016).

While Defendants were operating their 1-800 Water Damage franchise, they maintained a Google Business Profile which contained customer-written reviews of the services provided.  (ECF No. 4-1 at PageID. 339.)  At some point prior to

14

January 5, 2024, Defendants changed their Google Business Profile from the 1-800 Water Damage franchise to Restoration RX, but the Profile, under this new name, retained reviews written by customers who received services from Defendants when they were operating a 1-800 Water Damage franchise.  (ECF No. 4 at PageID. 210.)

Plaintiff has attached images of the customer reviews associated with Defendants' Google Business Profile to its motion.  Despite appearing under the same Profile, reviews appear for the two separate businesses: 1-800 Water Damage and Restoration RX.  In particular, one review under the Profile, written before the name changed from 1-800 Water Damage to Restoration RX, reads: "The team at 1-800 water damage is super impressive and professional.  They know how to get a job done quickly and correctly!  Would definitely recommend!"  (ECF No. 4-1 at PageID. 364.)  In contrast, another review, left under the same Profile after the name changed, was quite negative, referring to Restoration RX as a "SCAM," and specifically referring to an interaction with "an employee named Gerald, whose communication was less than satisfactory, leading to further frustrations."  (*Id.* at PageID. 363.)

In essence, Defendants' continued use of the 1-800 Water Damage Google Business Profile, and the customer reviews, in lieu of creating a new Google Business Profile for Restoration RX, results in positive reviews for 1-800 Water

15

Damage and negative reviews for Restoration RX appearing under the same Profile, which could lead to customer confusion.

Plaintiff argues that, absent an injunction, "Defendants' activities will cast the Water Damage brand in a negative light," and they will "continue to benefit from an unfair competitive advantage by diverting business that rightfully belongs to Water Damage and its existing and future franchisees." (ECF No. 4 at PageID. 224.) The Court agrees. Plaintiff has adequately alleged that Defendants' actions will cast them in a negative light and disadvantage them in competition. Customers inquiring about restoration services could reasonably be confused, based on these reviews, what association, if any, there is with Restoration RX and 1-800 Water Damage, and what level of service they will receive. This could damage Plaintiff's goodwill with its customers.

While Defendants argue that Plaintiff's claims of harm are speculative, Plaintiff "need not suffer harm in order to justify a preliminary injunction, so long as there is a realistic prospect of harm in the immediate future." *Collins Inkjet Corp.*, 781 F.3d at 280. This factor, therefore, weighs in favor of issuing the preliminary injunction.

### *BALANCE OF HARM TO OTHERS*

Next, the Court must balance the harms that Defendants would face if injunctive relief were granted with the harm that Plaintiff would suffer without

enforcement.  As the Sixth Circuit noted:

> [T]he purpose of the [balance of harms] test is . . . to underscore the flexibility which traditionally has characterized the law of equity. It permits the district court, in its discretion, to grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.

*Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982)).

Plaintiff argues that the only harm that could arise would be to Defendants and their customers, and such harm would be self-inflicted.  (ECF No. 4 at PageID. 224-25.)  The Court agrees.  Further, any harm that would be brought on by the issuance of the preliminary injunction would be minimal as any injunction would be narrowly tailored to preclude the use of Plaintiff's trademarks, in violation of the franchise agreements' non-compete provision, to avoid confusion.  As a result, "the court's decision will not have an impact on anyone besides the parties to this litigation."  *Apex Tool Grp., LLC v. Wessels*, 119 F. Supp. 3d 599, 610 (E.D. Mich. 2015) (citing *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 970 (6th Cir. 2002)).  This factor weighs in favor of issuing the preliminary injunction.

*PUBLIC INTEREST*

The public interest would be served by the entry of a preliminary injunction. The public has an interest in fair competition. The public also has an interest in the enforcement of legislatively enacted laws. *See Kelly Servs., Inc. v. Noretto*, 496 F. Supp. 2d 645, 660-61 (E.D. Mich. 2007). As a result, this factor weighs in favor of granting the preliminary injunction.

*SECURITY BOND*

Before issuing an injunction, the Court must consider an appropriate bond to be posted by Plaintiff. *See* Fed. R. Civ. P. 65(c). Rule 65 generally requires such security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained[.]" Fed. R. Civ. P. 65(c). A court may "dispense with the bond requirement where there has been no proof of likelihood of harm to those enjoined." *Lego A/S v. Zuru, Inc.*, 799 F. App'x 823, 837 (Fed. Cir. 2020) (internal quotation omitted); *see also Moltan Co. v. Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (alteration added) ("[T]he rule in our circuit has long been that the district court possesses discretion over whether to require the posting of a security bond.").

Plaintiff argues that through the franchise agreements, Defendants waived any right to damages in the event of a wrongfully issued injunction, making bond

unnecessary.  (ECF No. 4 at PageID. 228.)  The relevant portion of the franchise

agreements read:

> Nothing in this Agreement shall prevent us [Plaintiff] from seeking to obtain injunctive relief, without posting a bond, against threatened conduct that will cause us loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions. If injunctive relief is granted, your only remedy will be the court's dissolution of the injunctive relief. If the injunctive relief was wrongfully issued, you expressly waive all claims for damages you incur as a result of the wrongful issuance.

> (ECF No. 1-1 at PageID. 75, 160 (alteration added).)

The Court finds that parties have waived the bond requirement through the

franchise agreements.  *See Singas Famous Pizza Brands Corp. v. New York Advert.*

*LLC*, No. 10-8976, 2011 WL 497978, at *12 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468

F. App'x 43 (2d Cir. 2012) (waiving bond in a preliminary injunction where

operative franchise agreement stated that the franchisor "may have such injunction

relief without necessity of posting a bond").

## ATTORNEY'S FEES

Lastly, Plaintiffs seek attorney's fees and costs associated with this motion.

An award of attorney's fees is typically reserved for the end of litigation, however,

a prevailing party "may achieve some relief . . . before litigation [has] concluded,

an interim or interlocutory award of attorney's fees, called an award *pendente lite*."

*Nat'l Amusements, Inc. v. Borough of Palmyra*, No. 08–2469, 2010 WL 3199880,

at \*2 (D.N.J. Aug. 12, 2010) (citing *Hanrahan v. Hampton*, 446 U.S. 754, 757-58 (1980)).

Before a litigant may be eligible to recover fees as a "prevailing party," however, it must comply with the Court's procedural rules to obtain a fee award. *Quick v. Peoples Bank of Cullman Cnty.*, 993 F.2d 793, 799 (11th Cir. 1993). The operative procedures are specified in Federal Rule of Civil Procedure 54 and Local Civil Rule 54.1.2. Federal Rule of Civil Procedure 54(d)(2) provides that: "Unless a statute or a court order provides otherwise, [a] motion [for attorney's fees] must . . . be filed no later than 14 days after the entry of judgment." Fed. R. Civ. P. 54(d)(2). The Rule defines "judgment" as "a decree and any order from which an appeal lies." Fed. R. Civ. P. 54(a). Similarly, Local Rule 54.1.2(a) provides that: "A motion for attorneys' fees and related non-taxable expenses pursuant to [Rule]. 54(d)(2) must be filed no later than 28 days after entry of judgment." Moreover, Local Rule 54.1.2(b) provides that:

> A motion for an award of attorneys' fees shall be supported by a memorandum brief as to the authority of the Court to make such an award, and as to why the movant should be considered the "prevailing party," if such is required for the award. The motion shall also be supported by an affidavit of counsel setting out in detail the number of hours spent on each aspect of the case, the rate customarily charged by counsel for such work, the prevailing rate charged in the community for similar services, and any other factors which the Court should consider in making the award. Within 14 days after filing of the motion, the party or parties against whom the award is requested shall respond with any objections thereto and accompanying memorandum setting forth why the award is excessive, unwarranted, or unjust.

20

LR 54.1.2(b). It is well established that an order is distinguishable from a judgment as:

> [T]he different consequences flowing from them, not only in the matter of enforcement and appeal but in other respects, as, for instance, the time within which proceedings to annul them must be taken. Rulings on motions are ordinarily orders rather than judgments. The class of judgments and of decrees formerly called interlocutory is included in the definition given in [modern codes] of the word "order."

> 1 A.C. Freeman, *A Treatise of the Law of Judgments* § 19, at 28 (Edward W.

Tuttle, 5th ed. 1925) (quoting Black's Law Dictionary 1130 (8th ed. 2004)).

Furthermore,

> An order is the mandate or determination of the court upon some subsidiary or collateral matter arising in an action, not disposing of the merits, but adjudicating a preliminary point or directing some step in the proceedings.

> 1 Henry Campbell Black, *A Treatise on the Law of Judgments* § 1, at 5 (2d

ed. 1902) (quoting Black's Law Dictionary 1130 (8th ed. 2004)).

Here, the Court is entering an order on Plaintiff's motion, not a judgment. For the Court to consider an award for interlocutory attorney's fees, or award *pendente lite*, Plaintiff would need to follow the procedures set forth in Local Rule 54.1.2(a)-(b). Plaintiff has failed to do so at this juncture. Thus, the Court denies Plaintiff's request for attorney's fees.

## IV.   CONCLUSION

The Court finds that all factors weigh in favor of issuing the preliminary injunction to prevent any further violation of the franchise agreements' non-compete provisions on the use of Plaintiff's trademarks during the pendency of this case.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for preliminary injunction (ECF No. 4) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants are **TEMPORARILY ENJOINED** and **RESTRAINED** from any further violation of the franchise agreements' non-compete provisions on the use of Plaintiff's trademarks, while conducting their business.

**IT IS FURTHER ORDERED** that Plaintiff's obligation to post bond is **WAIVED**.

**IT IS FURTHER ORDERED** that Plaintiff's request for attorney's fees is **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 31, 2024